We'll hear argument now in number 20-1004, Shanzhou Trina Solar Energy v. United States, Mr. Brightbill. Good morning, Your Honors. May it please the Court. I hope you, your colleagues, and your families are all well. Our appeal covers two issues, the offset for the Export Buyers Credit Subsidy Program and the valuation of Trina's solar glass, so I will request your concern. Mr. Brightbill? Yes. This is Judge Wallach. On page 26 of the blue brief, you say that because the term export subsidy in 19 U.S.C. 1677 AC1C is ambiguous, we should defer to Commerce's reasonable interpretation of that term, that is, export subsidy excludes AFA determinations. Does Commerce itself say anywhere that the term export subsidy is ambiguous? I believe that Commerce has, by ruling the way that it did, that an export subsidy does not cover situations where adverse facts available are involved. I believe its ruling does do that. I don't know if it states it exactly in that way. Did it offer any definition of export subsidy other than the statutory definition? No, not to my knowledge, Your Honor. I believe the whole issue was what to do in a situation where the Chinese government fails to respond and therefore it's impossible to determine whether the program is an export subsidy, a situation that they've dealt with many times. Which I know they have, Mr. Brightbill. Yes. What exactly then are you asking us to-to what are you asking us to defer the opinion? So what we're saying is that what the Court of International Trade did was to improperly direct Commerce what to do here by directing Commerce to offset the dumping margin for this subsidy program. Let me be clear. I didn't mean the CIT opinion. I meant Commerce's determination. Are you asking us to just simply defer because they made a determination? Well, if that determination is reasonable, consistent with the statute, and based on substantial evidence, yes. Okay. That's a circular argument from my viewpoint. On page 20 of the blue brief, you argue that this court applies our deference to Commerce's reasonable interpretation of its own orders. And that as such, we should defer to Commerce's reasonable interpretation of its own unpublished IND memo. Can you cite any legal support for the conclusion that we give our deference to Commerce's interpretation of an unpublished IND memo? Your Honor, the case that we cited in our brief is the Diamond Sawblades case, where there was- But Commerce's interpretation of its own regulation. Well, Your Honor, actually-yes, Your Honor, I'm sorry to interrupt. In Diamond Sawblades, it was not a regulation that was being interpreted. It was a final modification, which was published in the Federal Register, but was not a regulation. And so, that final modification is something that Commerce authored, and therefore, this court decided that it was appropriate to defer to Commerce as the author of that modification. So how does that support unpublished IND memos? Well, again, Commerce is the author of that decision memo, which forms the basis for the final determination. And therefore, it's entitled to deference on its interpretation of that and of the law as to whether or not it can apply adverse facts available to determine that the program is a subsidy and countervailable. But did Commerce rely on adverse facts available to make the determination that this was not an export subsidy? I thought it used adverse facts available to determine that the Chinese companies took advantage of the export subsidy, or of the export bank. Your Honor, Commerce made clear that it was prevented on both findings from making that determination, and it was prevented from determining whether the program was an export subsidy. Where does the decision say that? So, we mentioned that in our opening brief on page 22, and that cites to the decision memo at pages 91 to 94, where the Commerce-where the government of China failed to respond to even basic questions about how the program is operated. And therefore, Commerce-because it lacked those answers, it was impossible to determine whether this was an export subsidy with respect to the Chinese solar industry. I'm sorry, where does it say that? This is in the Countervailing Duty Investigation Issue and Decision Memo at page 91. It's discussed at pages 9 to 11 of our brief. Appendix 91. This is Appendix 91. I'm sorry, Your Honor, it's not Appendix 91. It's the Decision Memo at page 91. I think it's- What page of the appendix? Okay. So, that's Appendix pages 113 to 156. It's- That does not help me. That does not help me. 113 to 156. What page discusses this? Okay. I'm sorry, Your Honor, I'm not able to scroll through it. Let me try to find the proper discussion. Let me- Page 9. Okay. Sorry, Your Honor, it's page 30- it's Appendix 115. Well- Your Honor, I'm very sorry. I don't recall that there is any such finding or use of adverse facts available to determine that this is an export subsidy, as opposed to the question of whether the individual companies used the Ex-Im Bank. So- So, while the Department states that it did not make a determination that the program was an export subsidy, and it states that, instead, its decision to countervail the program was based on facts otherwise available with an adverse inference as a result of non-cooperation by the government of China. So, they did not make a determination that the program in question was contingent on export performance. But they- And they- At the time, it was actually commerce's practice not to do this, and they cited several other commerce determinations where they made a similar finding. So- You're saying that in the countervailing duty to the proceeding, they didn't make a determination that this was an export subsidy? That's correct, Your Honor. So- And, again, this is in the dumping decision memo at page 9 of that- Well, this is directly contrary to what you told me three minutes ago, right? You said they used AFA to determine. Well, they did not make a determination that it was an export subsidy, and, therefore, without a determination, they- In the CBD investigation, that the program provides subsidy contingent on export performance- This is Judge Chen. I'm getting a little lost. How was commerce able to impose a countervailing duty without making a finding that there was an export subsidy program that was, in fact, used by these Chinese importers? They- What the department found was that they had to apply adverse facts available in finding that the program was used by the respondents, and that, because of the lack of information from the government of China, they determined that facts available were warranted and that respondents used and benefited from the program. So they made that determination in the countervailing duty case, but they never made a finding that it was an export subsidy per se. I'm lost. They imposed a countervailing duty here, right? They calculated a countervailing duty. They did, yes. And they can- They have the authority to do that without finding that there was an export subsidy program? They have to find a subsidy. They have to find that there's a benefit and a financial contribution. Okay, so they did find an export subsidy then. They necessarily had to. It's a core element before they calculate a countervailing duty, isn't it? Now, if the government of China does- This is the whole point of our appeal, is that if they don't receive the information to make a determination of whether it's an export subsidy or not, they can apply adverse facts available and still apply a countervailing duty. They apply adverse facts available to conclude that, in fact, it is an export subsidy program and that the Chinese companies took advantage of that program. Commerce was- Well, Your Honor, commerce was quite clear that it did not make a determination as to whether it was an export subsidy program or not. And how would they have the authority? How would they have the statutory authority to impose a countervailing duty? Well, it can be either an export subsidy or a domestic subsidy, but in either event, they're able to impose a countervailing duty. They found this was a domestic subsidy? No, Your Honor. How could the Ex-Im Bank subsidies be a domestic subsidy? It had to be an export subsidy, right? That's the whole purpose of an export-import bank. Your Honor, commerce was prevented from determining whether it was an export subsidy because of the lack of cooperation and because- How could it be anything except an export subsidy? Well, they don't know. How could it be a domestic subsidy? Your Honor, again, the burden is on respondents to provide some basic information about how the program works, and they did not do so here. So the Commerce Department properly decided that it would base a determination on adverse facts available. They lacked the information- And what was that determination they made when you say they based that determination on adverse facts available? What was that determination? That it was an export subsidy program used by these Chinese importers? Yes, they determined whether they should apply adverse facts available to the Ex-Im Bank Buyer's Credit Program. So they interpreted the order as applying adverse facts available, and then they determined whether it constitutes an export subsidy and whether that is reasonable. Yes. Was there an issue in the countervailing duty proceeding as to whether this was the Ex-Im Bank provided export subsidies? Was that an issue? Well, Your Honor, it was certainly an issue in that it was one of the main subsidy programs analyzed. Was there any issue that the Chinese Export-Import Bank provided export subsidies? That wasn't an issue, was it? Well, the Department did not determine that they were export subsidies per se. I'm asking you whether there was any contention that in that proceeding that those subsidies provided by the bank were domestic subsidies or whether they were export subsidies. Is it not true that everybody assumed that the bank provided export subsidies? I think it was an assumption that everyone made. Yes, it was just not supported by any fact, and that's why the Commerce Department decided not to offset the dumping margin with the CBD margin in this case. So I just also wanted to highlight that there's an important policy issue here because this issue comes up in just about every investigation. And the lower court's ruling here would force the Commerce Department to negate the subsidy filing by subtracting most of that margin from the dumping margin. The Department has the ability to use facts available. Well, they have to do that if it's an export subsidy, right? They don't have any discretion about it. If it's an export subsidy, they have to, to avoid double counting, they have to add it to the U.S. price, right? But again, Your Honor, if they don't... Is that not correct? That, is my statement correct? The law states that if, if it is an export subsidy, it will be deducted. So the question though is, Commerce stated quite clearly that it was not able to make that determination. And therefore, because it wasn't able to make the determination, it would not offset the dumping duty with the countervailing duty. And, and that's the proper position because if there's an offset, then that removes any incentive for the Chinese government ever to provide information regarding this program. And the entire purpose of facts available to induce cooperation is undermined by that decision. We'll, we'll never find out what this Chinese subsidy program is or how it works because, because the offset exists. You just told me nobody, nobody had any doubt about what the program was. Well, Your Honor, it was an assumption based on the information available. But again, because, because the government of China failed to respond, the Commerce clearly did not make a finding that it was an export subsidy for purposes of this, of this matter. All right. Any further questions for my colleague? Yes, this is Judge Wallach. Let me just take you to the, your, your factual question, your sandwiched glass question, Mr. Bright, Bill. Commerce defines laminated glass as, quote, made in sandwich form with one or more inner layers of plastic between two or more sheets of, of glass. On page 42 of the blue brief, you say that Commerce erred when it said there was no record evidence that Trina's glass was laminated because it failed to consider that some of Trina's module glass uses a plastic front sheet. How is a plastic front sheet evidence of multiple interlayers of plastic? And, and did you challenge Commerce's definition of laminated glass somewhere in the record? Your Honor, I, I think the fact that there is anti-reflective coating in the punch sheet, as you mentioned, suggests that there, that there are multiple, that there are layers of plastic in glass. We don't know if there are multiple layers or not. Where, where's the sandwich? Yeah, interlayers, interlayers. No, Your Honor, I think the, the point we were making is that Commerce determined that there was no record evidence of additional working. So regardless of the multiple layers point, there was additional working that would result in glass comparable to laminated glass. There was evidence of that additional working on the record and therefore Commerce's conclusion was, was incorrect. All right, unless there are any further questions, let's hear from Mr. Kerland. We'll give you two minutes for rebuttal, Mr. Breitfeld. Thank you, Your Honor. This is Mr. Kerland. Good morning, Your Honors, and may it please the Court, our remarks are addressed solely towards the module glass issue. And in that regard, Commerce's determination that the appropriate surrogate value for Trina's module glass was the tempered glass surrogate value rather than the module glass, I'm sorry, the laminated glass surrogate value. It should be affirmed by this Court  by substantial evidence and otherwise lawful. As an initial matter, there is no party that disputes the record fact that Trina's glass is tempered glass. Commerce cited that evidence at Appendix page 141 looking in turn to Appendix pages 46-47 and 55-49 to 55-68, in particular 55-50 uses the term tempered glass. So that's not an issue. But it's equally the case that Commerce reasonably determined that the record did not support this idea that Trina's glass was both akin to laminated glass, which as your honors have already noted, the record indicates has additional characteristics. In particular, the World Customs Organization explanatory note indicates that it's made in sandwich form with one or more interlayers of plastic between two or more sheets of glass. That is not what the evidence indicated. And in particular, we would note that Appendix page 6-7-5-7-67-57 of the record, that's Solar World's reply brief in the trial court proceedings and Solar World indicated there that it said, well, Trina's glass may not be layered. So that should be the beginning of the end of it. And the end of it, they've acknowledged that the glass involved is not layered. No one had, to answer your honors question to Appellant's counsel, no one had made the challenge that this World Customs Organization explanatory note was inaccurate or wrong. That's a given in the record. And as far as I know, it was uncontroverted. I think we have one additional thing to say, or one or two additional things to say about this idea of this statement in one record document, which I will note is not Trina's record document, but is a data sheet from another company that in turn Trina said that its product is not dramatically different from that other company's data sheet. When it refers to plastic, it's this one reference and it specifically says that thin film modules may have plastic as a front sheet. And so there are several flaws there. The most direct of which is that it's referring to thin film modules. And as the intervenors, Trina, have pointed out, not only are thin film modules excluded from the order here, but their products aren't thin film modules. They confirmed that. And then of course it's May and it's the front sheet. So that consistent with what Commerce said in its issues and decision memorandum does not provide any evidence that this glass is a sandwich form, interlayered glass with plastic between two or more sheets of glass. Hence, what Commerce said there is reasonable. I would further note that Commerce, appendix page 140, cited specifically this, not this information about plastic, but this piece of evidence. Essentially, it summarized SolarWorld's arguments and made clear that it considered the arguments and evidence that SolarWorld was putting forward. But importantly, this particular statement about the thin film modules containing plastic was not a statement that SolarWorld has pointed to at any time in the proceedings, either before Commerce or the trial court before coming before this court. And I think now they've seized on the word plastic to say, to try to kind of shoehorn it into this idea of interlayers of plastic and glass. We know that there's an exhaustion issue there, but I think even at a more... This is Judge Chen, just a quick question. The appellant's argument, I'm sorry, I'm going to the offsetting question, and I just want to know what Commerce's position is, seems to be at least premised on the idea that you don't always have to find that there's an export subsidy in order to impose a countervailing duty rate. Does Commerce believe that? Well, Your Honor, unfortunately, I cannot speak substantively to the export buyer's credit program issue because we haven't appealed that issue and I have no authorization from the attorney general to speak on that issue.  as a point of clarification is that countervailing duties are imposed on the export different manners of subsidies of which export subsidy is just one. And I think that that seemed to be the confusion in the discussion with appellant's counsel, but I think I would be overstepping my bounds if I said more than that. The last point we were going to make on the module issue is simply that leaving aside kind of exhaustion and waiver concerns, if your argument before this court is that Commerce erred because it failed to consider evidence that before it, it seems logical and appropriate for the court to demand that the evidence you're pointing to, the evidence that you as a party have, you know, at least raised before Commerce and the trial court. And so that's the issue here. Commerce certainly cited that data sheet and the other parts of it that Solar World was quoting, but it seems inappropriate given that they specifically point to this reference to plastic now. It seems inappropriate to then claim that Commerce didn't address that specific language when they themselves didn't raise it. Unless the court has further questions, we respectfully urge that the court affirm Commerce's decision as to the module glass surrogate value. OK, thank you, Mr. Kerlin. Mr. Freed. Good morning, Your Honors. May it please the court. First, I would like to speak briefly on the hour deference issue. Our position is it does not apply because there's no rule or regulation that Commerce is interpreting here. And appellants are citing to Diamond Sawblades and tends to characterize the final modification as analogous to a Commerce determination. The final modification announced an agency-wide modification to the methodology for determining dumping following a WTO dispute settlement body determination. So the final modification was issued after notice and comment and applied to all current and future antidumping investigations as of the effective date of the modification. It was not an agency determination based on administrative record. I think that's a clear distinction. Explaining why it doesn't apply here. This case arises out of the first review of the antidumping order products from China. In the original investigation, Commerce considered whether to offset antidumping duty deposits for export subsidies and specifically the export buyer's credit program. And in that case, the petitioners argued that they should not offset for the export buyer's credit program. Let me just ask you this question. Has anybody ever suggested that Ex-Im Bank support is a domestic subsidy as opposed to an export subsidy? I'm not aware of any such reference, Your Honor. How could it be anything other than an export subsidy if it exists? I do not know. The attempt to... One distinction I want to make is that the question has been asked, you know, is it necessary that Commerce find it to be an export subsidy in order to impose the countervailing duty? It's necessary that Commerce find the program to be specific and export contingency is one basis for determining specificity of a program. It wouldn't be necessary, as Your Honors have noted, it could be a domestic subsidy. You could countervail domestic subsidies and you would have a different basis for determining their specificity because they would not be contingent on export. If Commerce were... They need not make a determination that the basis for specificity is export contingency in order to impose the countervailing duty. The argument by appellants is that they've made a export... They've determined it to be an export subsidy based on facts available. But if that were the case, if there really wasn't... weren't facts available to determine that it was export contingent, then why call it an export subsidy in any event? They could just say there's deficient information to determine the basis for specificity and we are relying on some fact. Another point to consider is that when Commerce applies AFA, there's a two-step process. AFA is not licensed to just not consider all of the statutory requirements. So there's nothing in the CBD decision memo that says they were making a decision based on specificity based on adverse effects. The government has told us that everybody in the countervailing duty proceeding simply assumed that XM Bank subsidies are export subsidies. Is that correct? I think that is the assumption. They're not explicit. So they weren't making... even had to make any determination about whether it's an export subsidy because everybody assumed it was. And we cite in our brief, in the original investigation, Commerce explicitly said in the AD case, they said we have to make this offset because it's an export subsidy. And SolarWorld argued that they shouldn't because it was based on AFA and Commerce... the SolarWorld appealed to the CIT, Commerce distended its position that this was an export subsidy for which the statute required an adjustment. And the CIT sustained the Commerce decision. Then fast forward to the first review, Commerce changes its mind and says, wait a second, we don't want to give this offset where we're applying AFA to the XM Buyer's Credit Program. But what's important here is understanding that the rate that Commerce would use as the offset in the first review is the exact same rate Commerce already determined in the original investigation was an export subsidy requiring adjustment. Because in reviews, Commerce, when they look to determine what is the rate we need to incorporate into our US selling price calculation, they look back to their most recently completed segment of the proceeding. In contrast, in investigations, Commerce uses the companion coincident CBE investigation for making the adjustment. So, you know, we're not even citing to other cases where Commerce has found this to be an export subsidy and trying to extend it to. Commerce already found that this exact determination of the countervailing duty imposed for the export buyer's credit program is the basis for making the adjustment in the first review. I want to make a few more points. One, there was no change in practice. We explained in our brief that the Commerce's citations and then now SolarWorld's citations to changes in practice were to two preliminary determinations and investigations for which the respondents did not respond, which is not the case here. Here, the government of China responded, but there was some deficiency with regard to use of the program, as at least perceived by Commerce. The other point is that this does not, by applying the adjustment, it does not wash out the deterrent intended by applying AFA for non-cooperative parties. We explained in our brief that due to several factors in the anti-dumping calculation, it is not a wash. When it's applied here, we do not get a full 10.54% adjustment to the dumping rate due to several factors. I mean, it could be that you're not dumping. And so increasing the rate another 10% or increasing the price by another 10% doesn't result in any change or benefit to the responding party. I think the government addressed our issues on solar glass. So on that issue, I will rest on the brief. And if your honors have questions, I'll stop. Okay. Thank you, Mr. Freed. Mr. Brightfield, you have two minutes. Thank you, your honor. Just in response to the XM point and the questions, I think the clearest place that states what the department's finding was in the countervailing duty case is that appendix 121, the public version appendix, where the department states that the department did not, I'm quoting, the department did not make a determination in the CVD investigation of certain solar products from the PRC that the export buyers credit program was an export subsidy. Rather, the department's determination to countervail the program was based on facts otherwise available with an adverse inference as a result of non-cooperation by the government of China. And the department did not make a determination that the program in question was contingent on export performance. Mr. Brightfield, this is Judge Chen. You block quoted in your brief, your blue brief, pages 24 to 25, the actual findings that were made by Commerce in the first administrative review memo. And it says it leads that as explained in the use of facts otherwise available and adverse inferences section above, we are determining, relying upon AFA, that both companies use this program during the period of review. We find that financing from the Ex-Im Bank under this program constitutes the financial contribution with the meaning of the act. We further find that this program is specific because it is contingent upon export performance within the meaning of the act. So when it says it found financial contribution and that the program was specific, aren't those the elements of finding that something is an export subsidy? Yes, Your Honor, but this was a finding made in the solar cells case, not the solar products case, which is the case that we're talking about. So in an unrelated proceeding, different proceeding, they did make this finding of specificity. But in this proceeding on the anti-dumping and countervailing duty records, they did not. So, and this is what the lower court partially quoted, was again from a different case, the solar cells case, rather than these cases, which are the solar module or solar products case. And what you quote from 121 is not the countervailing duty case, right? That's right. It's a summary, Your Honor, it's a summary of what the department stated its position was in the CBB case. Yes. So it's from the anti-dumping decision memo in this case. So with that, we think that Commerce is entitled to deference based on its ruling and based on its order. And the court mistakenly reinterpreted that order in this case. Thank you very much. Thank you, Mr. Brightbill. Thank all counsel. The case is submitted. That concludes our session for this morning. The honorable court is adjourned until tomorrow morning at 10 a.m.